UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
  JOSEPH FASANELLO,                                    :
                                                       :
                                      Plaintiff,       :
                                                       :
              -against-                                :
                                                       :
  UNITED NATIONS INTERNATIONAL                         :
  SCHOOL,                                              :
                                                       :
                                      Defendant.       :
------------------------------------------------------------ X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/23/22
```

1:19-cv-5281-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Joseph Fasanello, the former Director of Purchasing for Defendant, United Nations

International School ("UNIS"), brought this suit in June of 2019, alleging that UNIS discriminated

against him in violation of the Family and Medical Leave Act (the "FMLA") and the New York City

Human Rights Law (the "NYCHRL").  Plaintiff worked for Defendant for over 18 years.  In 2018,

six weeks after returning from medical leave, Plaintiff was terminated for allegedly making

misrepresentations to the human resources department at UNIS.  Plaintiff contends that his

termination was in fact motivated by his recent FMLA leave and medical conditions.

There is one key factual dispute between the parties:  whether or not Plaintiff lied to the

human resources department about his attendance at a school assembly.  UNIS claims he did and

that he was terminated because of his misrepresentations.  Plaintiff says he never lied and that he

accurately answered the questions posed to him during his meetings with the human resources

department.  Because on summary judgment the Court must credit Plaintiff's version of events, the

Court cannot conclude that Plaintiff misrepresented his whereabouts.  Therefore, a reasonable jury

could conclude that the reason Defendant offered for Plaintiff's termination was pretextual and the

Court must deny Defendant's motion for summary judgment on Plaintiff's discrimination and

retaliation claims.  However, the Court grants Defendant's motion for summary judgment on Plaintiff's failure to accommodate claim because none of Plaintiff's requests for accommodation were denied.

## II.   BACKGROUND

### A.  Facts[1]

Plaintiff worked for UNIS from January 2000 until his employment was terminated on September 28, 2018.  Plaintiff's Response to Defendant's Local Rule 56.1. Statement, Dkt. No. 95 ("56.1 Statement") ¶¶ 5, 172.  UNIS is a "pre-K-to-12th grade coeducational day school" providing an international education to the children of United Nations parents.  *Id.* at ¶ 1.  Plaintiff began working at UNIS as a procurement officer.  *Id.* at ¶ 5.  He was later promoted to become the school's Purchasing Director and then to his final position as Director of Purchasing.  *Id.* at ¶ 6. Plaintiff reported to UNIS's Chief Financial Officer, Stephen Roache.  *Id.* at ¶ 8.  During his 18 years of employment at UNIS, Plaintiff maintained a 6:30 a.m. to 2:30 p.m. work schedule.  *Id.* at ¶ 110 (citing Declaration of Douglas Klein, Dkt. No. 84 ("Klein Decl."), Ex. 45).

### i.   Plaintiff's Medical Leave in 2018

Plaintiff suffers from hypertension and several orthopedic conditions, including a torn rotator cuff, a torn labrum, two torn meniscuses, and various back issues.  Klein Decl. Ex. 2 ("Fasanello Deposition"), Tr. 29:3–10.  In January of 2009, Plaintiff had a heart attack and underwent quadruple bypass surgery.  56.1 Statement ¶ 9.  After his surgery, he was on short-term disability leave for three to four months.  *Id.*

On March 15, 2018, Plaintiff emailed Mr. Roache that he was experiencing "some health related issues" and that he had been "cautioned" by his doctor "not to engage in any work related

---

[1] The Court views the facts in the light most favorable to the plaintiff.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).  Unless otherwise indicated, the following facts are undisputed.

activities" until his condition improved.  Klein Decl. Ex. 10; 56.1 Statement ¶ 10.  Plaintiff was out

sick until March 23, 2018.  56.1 Statement ¶ 22.  Between March 23, 2018 and March 30, 2018,

Plaintiff worked from home.  *Id.* at ¶ 26.  Christine Havericak, UNIS's Director of Human

Resources, emailed Plaintiff on April 2, 2018, approving his request to work remotely temporarily

and requesting additional information from his doctor.  Klein Decl. Ex. 19.  Plaintiff provided UNIS

with an updated letter from his doctor on April 10, 2018.  *Id.*  Plaintiff's doctor, Dr. Jaime Lara,

wrote that Plaintiff was improving but that "his blood pressure remains significantly elevated and

needs frequent monitoring at home as well as periodic short rests in bed in order to control the

level."  Klein Decl. Ex. 20.  Dr. Lara also described "severe pain in his back" and "chronic pain in

both knees" that required Plaintiff to take medication, rest during the day in bed, and reduce

walking.  *Id.*  Dr. Lara only approved Plaintiff to return to work if he could work from home.  *Id.*

Plaintiff provided UNIS another letter from his doctor on April 19, 2018.  Klein Decl. Ex.

22.  That letter permitted Plaintiff to work from the office for a "trial period" of two days per week.

*Id.*  Plaintiff then began working from home three days per week and from his office the other two

days.  56.1 Statement ¶ 37.  On May 18, 2021, Plaintiff sent Ms. Medina an update from his doctor

stating that Plaintiff would be able to "return to working on a full-time basis, 5 days per week, at his

office in Manhattan without any specific limitations within 2 weeks . . . ."  56.1 Statement ¶ 40; Klein

Decl. Ex. 24.

On June 6, 2018 and June 12, 2018, Plaintiff told Mr. Roache by email that he was sick and

would not be at work.  56.1 Statement ¶¶ 43, 44; Klein Decl. Exs. 26, 27.  Mr. Roache forwarded

Plaintiff's June 12, 2018 email to Ms. Medina and Mr. Uy writing, "I am confused by Mr. Fasanello's

work status.  Although he is calling out sick, he is continuing to approve items through docuware

from home etc..  And yet, when I ask him to prepare or perform changes to the purchasing policy,

he says he is out sick, resulting in me taking time out of my busy schedule to perform all of his

work."  Klein Decl. Ex. 27.

Plaintiff sent Ms. Medina and Ms. Havericak a doctor's note regarding his absence on June

12, 2018.  56.1 Statement ¶ 47; Klein Decl. Exs. 28, 29.  Dr. Lara wrote that Plaintiff "has been sick

and unable to work and under my care since June 8.  His expected date of return to work is June

14."  Klein Decl. Ex. 29.  Mr. Roache sent another email to Ms. Medina and Mr. Uy on June 14,

2018, writing, "as my work load has increased particularly during year end as a result of Mr.

Fasanello's absence, please provide an update regarding his work status."  Klein Decl. Ex. 27.

On June 14, 2021, Plaintiff asked to be placed on short-term disability leave under the

FMLA.  56.1 Statement ¶ 51; Klein Decl. Ex. 30.  UNIS granted Plaintiff leave under the FMLA on

July 5, 2018, retroactive to June 14, 2018.  56.1 Statement ¶ 53; Klein Decl. Ex. 32.  On July 10,

2018, Plaintiff emailed Ms. Medina and requested that his FMLA leave be extended through August

15, 2018.  56.1 Statement ¶ 54; Klein Decl. Ex. 33.  On July 24, 2018, UNIS granted Plaintiff's

request to extend his FMLA leave with a return date of August 16, 2018.  56.1 Statement ¶ 58; Klein

Decl. Exs. 35 and 36.  Plaintiff returned to work in person, on a full-time basis, on August 16, 2018.

56.1 Statement ¶ 68.

ii.     Dr. Dan Brenner's Appointment as Executive Director

Dr. Dan Brenner was hired on August 6, 2018 as the Executive Director of UNIS.  *Id.* at

¶ 59.  He had previously worked as an administrator for the Roslyn Public Schools, a position he

held for 11 years.  *Id.* at ¶ 60.  He began working with the Roslyn Public Schools after the "largest

theft in American public school history by a prior administration."  *Id.* at ¶ 61.  According to Dr.

Brenner, his experience working in the Roslyn Public Schools "informed his expectations for how

business operations at a school must function."  *Id.* at ¶ 63.  Dr. Brenner expected all business

employees to work in the office until 4:00 p.m.  *Id.*  Dr. Brenner was asked by the Board of

Directors of UNIS "to implement more processes and controls around business practices, and to

hold all UNIS staff accountable if they did not perform their jobs adequately." *Id.* at ¶ 65.

  iii. <u>Plaintiff's August 2018 Requests for Accommodation</u>

When Plaintiff returned to work on August 16, 2018, he provided UNIS with a note from Dr. Lara (the "August 13 Doctor's Note"). Klein Decl. Ex. 38. The note described Plaintiff's medical conditions and listed a number of orthopedic devices that would be important for his return to work including, a "variable height desk, . . . a comfortable ergonomic chair . . . , a foot/leg rest . . . , and an ergonomic computer mouse." *Id.* Plaintiff received each of those items. 56.1 Statement ¶ 70.

The August 13 Doctor's Note also said that Plaintiff suffered from "serious medical conditions that are cardiac-related." Klein Decl. Ex. 38. Dr. Lara noted that Plaintiff's office was "located away from drafts and is entirely protected from the outer elements . . . [and] has a thermostat where he can control both heating and cooling." *Id.* Dr. Lara said it was "essential" that Plaintiff continue to work in such an environment because having a "stable temperature environment should help overall with [Plaintiff's] medical conditions." *Id.*

In September, Ms. Havericak asked Plaintiff if he would be "interested in moving" his office . . . into the business office, or into the area where Michelle used to sit." Klein Decl. Ex. 48 (the "Sept. 17, 2018 Tr."), at 16. It was "Plaintiff's decision whether he wanted to move offices" and "Plaintiff said he did not want to move his office." 56.1 Statement ¶ 130. Plaintiff was not moved out of his office. *Id.*

  iv. <u>Plaintiff's Return to Work</u>

According to Plaintiff, he was treated differently by his colleagues after he returned from FMLA leave. Fasanello Deposition, Tr. 159:16–19. He asserts that he was invited to fewer business meetings and that he was "treated overall differently by [Mr. Roache], by [Ms. Havericak], by [Mr. Uy]." *Id.* Plaintiff said that Ms. Havericak would "postpone" or not show up to meetings. *Id.* at

162:6–14.  Plaintiff could only point to one example.  56.1 Statement ¶ 78.  Ms. Havericak

postponed a meeting with Plaintiff because she "had a conference call that ran significantly over."

*Id.* (quoting Klein Decl. Ex. 39).

Plaintiff said that Mr. Roache seemed "angry that my absences caused additional work for

him" and that Mr. Roache would exclude him from meetings.  Fasanello Deposition, Tr. 166:18–25.

Mr. Roache acknowledged that Plaintiff had been excluded from certain meetings that Mr. Roache

"thought he should attend."  Klein Decl. Ex. 8 ("Roache Deposition"), Tr. 89:13–91:24; 56.1

Statement ¶ 80.  Mr. Roache was not responsible for organizing these meetings and did not know

why Plaintiff was excluded from them.  *Id.*

Plaintiff also says he was not allowed to carry over his unused vacation days, despite always

having been permitted to do so previously.  Sept. 17, 2018 Tr. at 28, 30.  On July 10, 2018, while out

on FMLA leave, Plaintiff asked members of UNIS's Human Resources department if he could carry

over "all of my thirty unused paid vacation days from the 2017-2018 SY for my use in the 2018-2019

SY."  56.1 Statement at ¶ 55; Klein Decl. Ex. 33.  Plaintiff did not hear back immediately.  He

emailed Ms. Medina and Ms. Havericak again on July 17, 2018, to ask about carrying over his unused

vacation days.  56.1 Statement at ¶ 56; Klein Decl. Ex. 34.  Ms. Havericak replied the following day

that she "would review his request" and get back to him.  56.1 Statement at ¶ 57; Klein Decl. Ex. 34.

Plaintiff sent another email to Ms. Havericak on August 24, 2018, asking about his unused vacation

days.  Klein Decl. Ex. 39.  Plaintiff received a letter, signed by Dr. Brenner, on August 24, 2018,

authorizing Plaintiff to carry over 15 of his unused vacation days from the 2017-2018 academic year

"as a on-time [sic] exception."  Klein Decl. Ex. 40.  Plaintiff was told he had to use the 15 vacation

days by December 31, 2018.  *Id.*

During a meeting in September, Plaintiff asked members of the human resources

department about his unused vacation days from the prior school year.  Sept. 17, 2018 Tr. at 28–34.

He said that it took UNIS seven weeks to respond to his request to carry over the unused vacation days and that he believed that "[t]he school intentionally delayed notifying" him to prevent him from using the vacation days. *Id.* at 28. He went on to say that "[w]hen you put all of these piece, um, events together, if there's a, there's a red thread with all of these things, okay? Retaliation, punishment. Okay? You know." *Id.* at 33.

According to UNIS, there was a "change in policy" when Dr. Brenner became executive director. 56.1 Statement ¶ 67. UNIS contends that no non-union employee other than Plaintiff was permitted to carry over unused vacation days into the 2018-2019 school year. 56.1 Statement ¶¶ 67, 133. During the September 17, 2018 meeting, Ms. Medina and Ms. Havericak informed Plaintiff that no one else was getting paid out for unused vacation days. Sept. 17, 2018 Tr. at 27–28. Ms. Havericak also said that Ms. Medina—who had 20 unused vacation days from the prior year—was not being permitted to carry any of them over into the new school year. *Id.* According to Ms. Havericak "other employees . . . have requested and been denied." *Id.* at 31; 56.1 Statement ¶ 134. Plaintiff was also informed in the August 24, 2018 letter that "vacation carry-over will no longer be authorized for any employee after the 2017-2018 academic year." Klein Decl. Ex. 40.

> v.   The September 7, 2018 Assembly

UNIS held an assembly for the junior school in the cafeteria on September 7, 2018 (the "September Assembly"). 56.1 Statement ¶ 90. Plaintiff did not attend that assembly. *Id.* ¶ 102. While seated at the September Assembly, Dr. Brenner saw Plaintiff walk past the room where the assembly was being held and leave UNIS's campus at around 2:30 p.m. *Id.* at ¶ 92. Plaintiff acknowledges that he left the school at 2:30 p.m. on September 7, 2018, as that was consistent with Plaintiff's work schedule up until that point. *Id.* at ¶ 92.

After Dr. Brenner saw Plaintiff leave, he confirmed with the security guard on duty that Plaintiff had swiped out of the building. *Id.* at ¶¶ 93, 94. Dr. Brenner then sent an email to Mr.

Roache and Ms. Havericak.  *Id.* at ¶ 95; Klein Decl. Ex. 42.  He wrote,

> [a]s I was watching the first Junior School Assembly in the cafeteria I witnessed Joe
> leaving at 2:30.  I cross referenced with security who validated that he left.  I am
> assuming he did not return and was leaving for the day.  My expectation is that all of
> your employees stay at least until 4:00 unless authorized by you with an explanation to
> me why there should be an exception.  Please let Joe know.

Klein Decl. Ex. 42.  Mr. Roache conveyed Dr. Brenner's message to Plaintiff the following Monday,

on September 10, 2018.  56.1 Statement ¶ 96.  Plaintiff was upset about the expectation that he be at

UNIS until 4:00 p.m., given that his schedule had always been 6:30 a.m. until 2:30 p.m.  *Id.* at ¶¶ 97,

110.  He immediately went to discuss the matter with Ms. Havericak.  *Id.* at ¶¶ 98–99.

vi.   <u>The September 10, 2018 Meeting</u>

Ms. Havericak and Plaintiff met on the morning of September 10, 2018.  *Id.*; Klein Decl. Ex.

44 (the "Sept. 10, 2018 Memorandum").  Ms. Havericak wrote a "memorandum to file" describing

her conversation with Plaintiff.  56.1 Statement ¶ 100; Sept. 10, 2018 Memorandum.  The parties

dispute what happened at the September 10, 2018 meeting.  Defendant contends that Plaintiff

denied leaving the school at 2:30 p.m. on September 7, 2018.  56.1 Statement ¶ 101.  According to

Defendant, Plaintiff told Ms. Havericak that he "was at the [junior school] assembly" and that "he

did not leave for the day on Friday."  Klein Decl. Ex. 44.

The September 10, 2018 Memorandum does not include the date "September 7" or the time

"2:30 p.m."  Ms. Havericak's notes include the following summary:  "JF was at the JS assembly and

'was becoming faint and nauseous' so he had to stand up because the chair wasn't good for his back.

Claims this can be validated by Isabel Cruz who asked if he was ok."  Sept. 10, 2018 Memorandum.

According to Plaintiff, he was not talking about the September Assembly when he made his

statements.  Instead, "he was referring to the 'assembly' which took place on August 29, 2018."  56.1

Statement ¶ 103; *see also* Declaration of Jon L. Norinsberg, Dkt. No. 96 ("Norinsberg Decl."), Ex. Y.

There was a mandatory staff training on August 29, 2018 that both Plaintiff and Ms. Cruz attended

8

(the "August Assembly").  *Id.*  It is in this disconnect that most of the subsequent events are rooted.

Read in the light most favorable to Plaintiff, he described his attendance at a meeting in August; Ms.

Havericak either misunderstood or misrepresented his statements to be that he had been at the

September Assembly and did not leave it at 2:30.

Following her meeting with Plaintiff, Ms. Havericak spoke to Dr. Brenner.  *Id.* at ¶ 105.  Ms.

Havericak conveyed to Dr. Brenner that Plaintiff had denied leaving at 2:30 on September 7, 2018.

*Id.*; *see also*, Klein Decl. Ex. 4 ("Brenner Deposition"), Tr. 66:14–67:23 ("What I can tell you is that

[Ms. Havericak] relayed to me that he denied leaving . . .");  Ex. 43 ("[Plaintiff] came to see me 1st

thing this morning claiming he didn't actually leave campus on Friday.").  In response, UNIS

reviewed security footage from September 7, 2018 "to confirm what time Plaintiff left school that

day."  56.1 Statement ¶ 106.  Dr. Brenner also "directed Ms. Havericak and Ms. Medina to meet

with Plaintiff" and Ms. Havericak scheduled a follow-up meeting with Plaintiff for September 17,

2018 at 1:00 p.m.  *Id.* at ¶¶ 107, 113.

vii.    Plaintiff's Request to Change his Work Schedule

After he learned that Dr. Brenner expected all staff—including Plaintiff—to work until 4:00

p.m., Plaintiff told Ms. Havericak that he would bring in a doctor's note supporting a requested

accommodation to maintain the earlier schedule he had kept for the previous 18 years.  *Id.* at ¶ 104;

Sept. 10, 2018 Memorandum.  Plaintiff and Ms. Havericak discussed this request during their

meeting on September 10, 2018.  *Id.*

Plaintiff also wrote Ms. Havericak an email on September 12, 2018, describing a September

10, 2018 conversation he had with Mr. Roache.  Klein Decl. Ex. 45.  Plaintiff said that Mr. Roache

"informed me in a very direct and aggressive way that unless I present the school with a letter from

my doctor attesting to my having a medical need for my early schedule, I would be required to

change my work schedule to a much later one."  *Id.*  He attached a letter from Dr. Lara that he

9

"hope[d] [would] satisfy the school's requirement." *Id.*

Dr. Lara said that following Plaintiff's heart attack and surgery in 2009, Plaintiff has "suffered from serious medical conditions" including "periods of elevated blood pressure, which historically occur in the afternoon hours of the work day." Klein Decl. Ex. 46. Dr. Lara explained that "[i]n order to control his elevated blood pressure as much as possible, and in consideration of his extremely serious heart condition, I strongly recommended to Mr. Fasanello that he schedule his work day in such a way as to leave his office for home by 2:30 p.m. every day." *Id.*

viii.   Plaintiff's September 17, 2018 Meeting with Ms. Havericak and Ms. Medina

Plaintiff, Ms. Havericak, and Ms. Medina met on September 17, 2018. From Plaintiff's perspective, this was a meeting to discuss his requested accommodation to maintain a 6:30 a.m. to 2:30 p.m. work schedule. Ms. Havericak responded to Plaintiff's September 12, 2018 email by asking for Plaintiff's "availability for Monday to meet to discuss this and the other concerns you have raised." Klein Decl. Ex. 45. According to Defendant, the primary purpose of the September 17, 2018 meeting was to confront Plaintiff about the September Assembly. 56.1 Statement ¶ 116. Ms. Medina took notes and made an audio recording of the meeting. *Id.* at ¶¶ 118, 119; Klein Decl. Ex. 47 ("Medina Notes"); Sept. 17, 2018 Tr. Ms. Medina did not inform the other participants in the meeting that she was recording it. *Id.* at ¶ 122. Ms. Havericak was therefore not aware that Ms. Medina was recording the conversation until after it ended. *Id.*

During the September 17, 2021 meeting, Plaintiff said that he had attended "the assembly." Sept. 17, 2018 Tr. at 5. Defendant contends that Plaintiff was referring to the September Assembly when he made that statement. Plaintiff maintains that he was referring to the August Assembly. 56.1 Statement ¶ 123.

Ms. Havericak did not ask Plaintiff to provide her with the date of the assembly and did not ask him the nature of the assembly. She first mentioned the date, September 7, 2018, only after

Plaintiff said he had attended "the assembly."  She said "[s]o, if you remember the email, September 7th was the day of the junior school assembly that you were at . . . ."  Sept. 17, 2018 Tr. at 10. Plaintiff did not mention the date of the assembly he had attended nor did he describe the content of the "assembly."  He referred to it only as an "assembly."

Plaintiff did describe what happened to him at the "assembly" and when he left the "assembly."  He said he "started sitting" and then "[h]ad to go to standing" because he was experiencing pain in his back.  *Id.* at 11.  Plaintiff told Ms. Havericak that he was "standing right next to Isabelle [Cruz]" and that she had asked him if he was doing okay.  *Id.*  Plaintiff told Ms. Havericak that he stood at the assembly for another 45 minutes, "at which point I couldn't stand anymore."  *Id.* He also told Ms. Havericak that he left the assembly around "2:30, 25 to 3:00, something like that." *Id.*  He told Ms. Havericak that after the assembly, he got a ride to the bus stop around 3:00 p.m. from a colleague, Jean Baptiste-Bassene.  *Id.*

Ms. Havericak, Ms. Medina, and Plaintiff discussed a number of other topics at the September 17, 2018 meeting, including Plaintiff's concerns about the change to his schedule, the possibility of moving his office, the carry-over of his unused vacation days, and Plaintiff's contention that he was being retaliated against for going out on sick leave.  *Id.*  They also talked about unrelated matters, including the number of cockroaches and mice in the school building.  *Id.* After Plaintiff left the meeting, in a hot mic moment, Ms. Havericak said, "What a f\*\*k face.  Shut the f\*\*k up."  *Id.* at 39.  Ms. Medina asked how she did during the meeting and Ms. Havericak responded that she "did well, but f\*\*k, man."  *Id.*

        ix.     <u>UNIS's Investigation of Plaintiff</u>

Following the September 17, 2018 meeting, Ms. Havericak investigated Plaintiff's alleged attendance at the September Assembly to determine if he was being honest.  According to Defendant, Ms. Havericak had concluded, following the September 17, 2018 meeting, that Plaintiff

confirmed his attendance at the September Assembly. *Id.* ¶ 139. Ms. Havericak learned that Ms. Cruz was scheduled for surgery on September 7, 2018 and later confirmed with Ms. Cruz that Ms. Cruz had not been present on campus at all on September 7, 2018. *Id.* at ¶¶ 140, 142. Plaintiff acknowledges that UNIS asked Ms. Cruz about her attendance at an assembly on September 7, 2018 but denies that the interview of Ms. Cruz was adequate to determine if Plaintiff was being honest, because in his version of events, which the Court accepts here, he had never said that he was present at the September Assembly. 56.1 Statement ¶ 142. Ms. Medina called Ms. Cruz but only asked Ms. Cruz "if she had been present on the day of question, September 7th . . . and if she attended any assembly." Klein Decl. Ex. 5 ("Medina Deposition"), Tr. 113:17–25. Ms. Medina did not mention Plaintiff's name to Ms. Cruz and did not ask her if she recalled sitting next to Plaintiff at an assembly, including the August Assembly to which Plaintiff had referred. *Id.* at 113 – 114.

No one interviewed Mr. Bassene as part of the investigation. *Id.* at ¶ 143. However, Ms. Havericak reviewed security footage and concluded that Plaintiff did not get a ride from Mr. Bassene on September 7, 2018. *Id.* There is no evidence that she investigated the date of the August Assembly, which Plaintiff said he had attended.

UNIS consulted with their counsel, Venable LLP. *Id.* at ¶ 144. Dr. Brenner directed Ms. Havericak to follow Venable's recommendation. *Id.* at ¶ 146. Ms. Havericak informed counsel that "Isabel Cruz, the individual that [Mr.] Fasanello told me was standing next to him at the assembly on September 7, has been out of the office on disability" and that, therefore, "we can count this as lie #3 . . . ." Klein Decl. Ex. 49. On September 25, 2018, counsel advised UNIS to "have a final meeting with [Mr.] Fasanello where we review with him the results of the school's investigation." *Id.* UNIS's counsel laid out three instructions: first, the school "should confirm each of his prior statements that we now know are inconsistent with actual facts . . . ." *Id.* Second, UNIS should "lay out for him the evidence UNIS has gathered that shows the inconsistency of his prior statements . .

. .” *Id.* And third, “you should be prepared to either suspend [Mr.] Fasanello without pay pending the conclusion of the investigation or fire him on the spot for dishonesty.” *Id.* Counsel advised that “if he tries to walk back his prior dishonest statements, . . . you suspend him for the time being.” *Id.* On the other hand, if he “admits to the dishonesty, which he may, then you can certainly terminate his employment immediately for dishonesty.” *Id.*

> x.    Response to Plaintiff’s Request for a Modified Work Schedule

Ms. Havericak sent Plaintiff an email on September 21, 2018 to “follow-up” on his request for a “modified work schedule to accommodate” his medical conditions.  Klein Decl. Ex. 50.

> [W]e are willing to discuss a modified schedule of some kind, or other alternative accommodations in order to accommodate a medical condition.  The problem thus far is we do not have any information for why you need the requested modification to your work schedule.  We are in receipt of your doctor’s note, but the note is silent as to why or how the requested modification to your work schedule would accommodate your blood pressure or other medical conditions.  We simply do not understand how a 90-minute adjustment to your work schedule helps you with your medical condition. When I asked you in person to explain the basis for the requested schedule modification, you refused to answer and instead simply told me to read your doctor’s note.  UNIS is asking you to provide an explanation for why you need the requested modification to your work schedule to accommodate your medical condition. This information is needed for UNIS to evaluate your request and to evaluate potential alternative accommodations that may accommodate you while simultaneously satisfying the school’s business needs.  If you continue to refuse to provide this information, your request may be denied.

*Id.*  Plaintiff responded five days later, on September 26, 2018.  *Id.*  He said he was “willing and able to provide any additional documentation that the school requires.”  *Id.*

> I have scheduled an appointment with my doctor during the week after I return from my vacation (which has been approved for October 1 through October 19) and I will seek to arrange for an additional letter from him as required by UNIS. [] I expect that I may need some additional accommodations from the school with respect to my orthopedic conditions (of which, the school should already be aware based on prior letters from my doctor), which I also plan to discuss with my doctor when I return from my vacation.  It would be ideal if you and I might be able to meet to discuss these additional accommodations shortly after my doctor appointment (and I am willing and able to provide any documentation that the school may require with respect to this at that time) – please confirm that HR is willing to meet with me in regard to this.

*Id.* Ms. Havericak did not respond to this email.  56.1 Statement ¶ 166.

   xi.  Plaintiff's Termination from UNIS

   Dr. Brenner directed Mr. Uy to meet with Plaintiff and gave Mr. Uy the authority to fire Plaintiff if Plaintiff's story remained the same.  Brenner Deposition, Tr. 106:20–107:15.  Mr. Uy and Ms. Havericak met with Plaintiff on September 28, 2018.  56.1 Statement ¶ 167.  Unbeknownst to the other participants in the meeting, Plaintiff made an audio recording of the September 28, 2018 meeting.  *Id.* at ¶¶ 168, 169; Klein Decl. Ex. 51 ("Sept. 28, 2018 Tr.").

   Mr. Uy began the conversation.  "[R]egarding September 7th and um, you leaving campus that day around 2:30.  Um, and when we talked to you about it, um, you responded with uh, some claims that you actually didn't leave campus at 2:30, you left uh, around 3:00."  Sept. 28, 2018 Tr. at 6.  Plaintiff responded by asking if that is the "date of the uh, the presentation that was in the theater?"  *Id.*  Mr. Uy said, "[a]pparently . . . the junior school assembly which you also said that you attended . . . ."  *Id.*  Plaintiff replied that "[t]hat wasn't the junior school assembly. . . .  It was a meeting in the theater that I was at, I wasn't at the junior school assembly."  *Id.*  Plaintiff said that it was not a "student presentation" that he attended.  *Id.* at 7.  Plaintiff could not recall the date or day of the week of the presentation he had attended.  *Id.*  Plaintiff further clarified that "I was only at one presentation, I wasn't at a junior school assembly."  *Id.* at 8.

   Mr. Uy said that Plaintiff had "misrepresented" to Ms. Havericak and Ms. Medina that he had attended the September Assembly.  *Id.* at 11.  Plaintiff responded that,

> [i]f there was a confusion on a date that took place a month or five weeks ago, that's one thing. . . . that's a confusion.  Don't, please don't accuse me of being a liar, that's not the case.  I was talking about the presentation that was given in the theater and I was clear that it was in the theater.  If whatever it is that, that, that uh, [Ms. Havericak] was talking about was not in the theater, we should have had some discussion at that point in time to clarify.  Because I don't know what you're talking about.

*Id.*  Mr. Uy told Plaintiff that "because of your misrepresentations, we're terminating you as of today from your duties."  *Id.* at 15.

The parties dispute when the decision to terminate Plaintiff was made.  According to Defendant, Dr. Brenner directed Mr. Uy to terminate Plaintiff if at the September 28, 2018 meeting Plaintiff did not acknowledge that he had left the school at 2:30 p.m. on September 7, 2018.  56.1 Statement ¶ 172.  Plaintiff points to evidence suggesting that the decision to terminate Plaintiff may have been made prior to the meeting on September 28, 2018.  *Id.* at ¶ 165.  Ms. Havericak testified that she discussed Plaintiff's September 26, 2018 email with Mr. Brenner and they decided not to respond since the decision to terminate him had already been made.  *Id.* at ¶ 166; *see also* Klein Decl. Ex. 7 ("Havericak Deposition II"), Tr. 54:14–24.  ("Q. Did it come up in your conversation with Mr. Brenner whether or not you should respond to Mr. Fasanello's request for a meeting?  A. It came up in the conversation, yes, with counsel the following day.  Q. And what resolution was reached?  A. To not respond to it because we have already made the determination to terminate him.").  Plaintiff also argues that Mr. Uy's decision to terminate Plaintiff was inconsistent with Dr. Brenner's direction because Mr. Uy was only authorized to fire Plaintiff if he continued to assert that he had attended the September Assembly.  According to Plaintiff, this further suggests that "UNIS planned to terminate Plaintiff irrespective of what he said at the September 28, 2018 meeting."  *Id.* at ¶ 172.

### B.  Procedural History

Plaintiff filed this lawsuit on June 5, 2019.  Dkt. No. 1.  On October 7, 2019, Plaintiff filed the First Amended Complaint, alleging that UNIS failed to accommodate his disabilities, discriminated against him on the basis of his age and disability, and retaliated against him by terminating his employment.  First Amended Complaint (the "Complaint"), Dkt. No. 20.  Plaintiff brings claims under the New York State Human Rights Law (the "NYSHRL"), the NYCHRL, the Age Discrimination in Employment Act, and the FMLA.  *Id.*

Defendant moved for summary judgment on July 31, 2020, arguing that Plaintiff was terminated for dishonesty and that Plaintiff has failed to put forth sufficient evidence to show that UNIS's reason for terminating Plaintiff was pretextual.  Memorandum of Law in Support of Summary Judgment ("Def.'s Mot"), Dkt. No. 83, at 3.  Defendant also argues that it provided Plaintiff with every accommodation requested and continued to respond to Plaintiff's requests for accommodation up until the time of his termination.  *Id.* at 3–4.  Plaintiff filed his opposition on October 7, 2020, arguing that UNIS's explanation for Plaintiff's termination was pretextual, as evidenced by the timing of Plaintiff's termination and the factual discrepancies in UNIS's explanation for its decision.  Memorandum of Law in Opposition of Summary Judgment ("Opp'n"), Dkt. No. 94, at 1.  Plaintiff argues that Defendant did not engage in a good faith interactive process when responding to his requests for accommodation as required under the NYCHRL.  *Id.* at 1–2.  Plaintiff explicitly abandons his age discrimination and NYSHRL claims in his opposition.  *Id.* at 23, n.4; *Id.* at 35, n.8.  Defendant filed its reply on November 16, 2020.  Reply Memorandum of Law in Support of Summary Judgment ("Reply"), Dkt. No. 102.

## III.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are

16

irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted). In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination.

*Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994)), *aff'd*, 470 F. App'x 20 (2d Cir. 2012). "However, even in such cases, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment and show more than some metaphysical doubt as to material facts." *Id.* at 275–76 (internal quotations omitted) (citing *Schwapp v. Town of Avon*, 118 F. 3d 106 (2d Cir. 1997); *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)); *Brown v. Johnson & Johnson Consumer Products, Inc.*, 92-cv-7886-KTD, 1994 WL 361444, at *3 n.3 (S.D.N.Y. July 11, 1994) ("To assert that [defendant's] witnesses may be lying, without any evidence to contradict the witnesses' testimony cannot defeat a motion for summary judgment.") (citation omitted).

## IV.   DISCUSSION

### A.   Unlawful Retaliation under the FMLA

The Court must deny Defendant's motion for summary judgment on Plaintiff's retaliation claim under the FMLA, because a reasonable jury could conclude that the reason UNIS gave for Plaintiff's termination—his alleged misrepresentation—was pretextual and that they in fact fired Plaintiff in retaliation for his recent disability leave.  Section 2615 of the FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  "The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220.  FMLA claims therefore "come in at least two varieties:  interference and retaliation. 'Retaliation' claims . . . involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017)

(internal citations omitted).  Plaintiff alleges that Defendant retaliated against him because he exercised his rights under the FMLA.  Compl. ¶ 80.

The Second Circuit has not yet definitively determined that the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in the context of a retaliation claim.  *See Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) ("We have never definitively applied the burden-shifting framework from the context of employment discrimination to FMLA retaliation, and we need not establish that application here . . . ."); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 n.7 (2d Cir. 2016) ("Since we find that [Plaintiff] meets the stricter *McDonnell Douglas* test, we need not decide today whether an easier test should govern.").  Nonetheless, the Second Circuit has applied the test in the context of such claims.  *See, e.g.*, *Graziadio*, 817 F.3d at 429; *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  And the parties apply the *McDonnell Douglas* framework in their briefing with respect to this claim.  Therefore, the Court "will analyze the retaliation claim[] brought pursuant to the FMLA under the burden-shifting test set forth in *McDonnell Douglas* . . . ."  *Graziadio*, 817 F.3d at 429.

> To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual.

*Id.* (quoting *Donnelly*, 691 F.3d at 147).

### 1. Prima Facie Case

As Defendant essentially concedes, Plaintiff has made out a prima facie case of retaliation under the FMLA.  *See* Def.'s Mot. at 17.  First, Plaintiff exercised his rights under the FMLA when he went on medical leave in July of 2018.  Second, Plaintiff was qualified for his position.  "[T]he ordinary standard for showing qualification is not exacting . . . ; plaintiff must show only that he

possesses the basic skills necessary for performance of the job." *Donnelly*, 691 F.3d at 151 (internal

quotation marks omitted).  Plaintiff held his job at UNIS for over 18 years.  Defendant offers no

evidence that Plaintiff was no longer qualified for his position.  Third, Plaintiff was terminated from

his position.

Fourth, Plaintiff has established that his termination occurred under circumstances giving

rise to an inference of retaliatory intent, which "can be established when there is a basis for a jury to

conclude that 'a causal connection [exists] between the plaintiff's protected activity and the adverse

action taken by the employer.'"  *Id.* at 152 (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d

Cir. 2003)) (modification in original).  "Temporal proximity between a plaintiff's exercise of rights

created by FMLA and adverse employment action can give rise to an inference of retaliation."  *Hill

v. N.Y.C. Hous. Auth.*, 220 F. Supp. 3d 499, 508 (S.D.N.Y. 2016).  There is no "bright line defining,

for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too

attenuated to establish causation."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

Plaintiff was terminated just six weeks after Plaintiff returned from FMLA leave.  56.1 Statement

¶¶ 68, 172.  Six weeks between returning from leave and termination is a relatively short period of

time, well short enough to support an inference of causation.  *See Nagle v. Marron*, 663 F.3d 100, 111

(2d Cir. 2011) (noting in the context of a 42 U.S.C. § 1983 First Amendment retaliation claim that

"six weeks fits comfortably within any line we might draw"); *Gorzynski*, 596 F.3d at 110 ("five

months is not too long to find the causal relationship").

### 2.  Defendant's Proffered Reason for Termination

Defendant proffers a legitimate, non-discriminatory reason for Plaintiff's termination.

According to Defendant, Plaintiff was terminated because he lied to Ms. Havericak and Ms. Medina

about his whereabouts on September 7, 2018.  Sept. 28, 2018 Tr. at 15.  Following Plaintiff's alleged

misrepresentations, Defendant undertook an investigation, consulted with its counsel, and ultimately

made the determination to terminate Plaintiff.  The burden therefore shifts back to Plaintiff to show that Defendant's proffered reason for his termination, his dishonesty, was pretextual and that the actual motivation was retaliation for his exercise of rights under the FMLA.

### 3.  Evidence of Pretext

Plaintiff has presented sufficient evidence of pretext to enable a reasonable jury to conclude that UNIS's asserted reason for his termination was pretextual.  As noted above, the short period between the date on which Plaintiff returned from leave and his termination supports this inference. Without more, this temporal proximity would not suffice to meet Plaintiff's burden.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); *see also Davies v. New York City Dep't of Educ.*, 563 F. App'x 818, 820–21 (2d Cir. 2014) (applying the rule articulated in *El Sayed* in the context of an FMLA retaliation claim and noting that "[w]e have been clear that temporal proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext."). But here, Plaintiff has identified two other categories of evidence that support the conclusion that Defendant's proffered reason for termination is pretextual.  First, Plaintiff points to a number of inconsistencies in UNIS's explanation for Plaintiff's termination.  Second, Plaintiff points to direct evidence of negative comments by UNIS employees that could reasonably be understood as criticisms of Plaintiff's efforts to exercise his rights under the FMLA.  Therefore, the Court cannot grant Defendant's motion for summary judgment on Plaintiff's FMLA retaliation claim.

### a.  Discrepancies in Defendant's Proffered Reason for Termination

Plaintiff points to several inconsistencies in UNIS's explanation for his termination as evidence of pretext.  "[A] plaintiff may prevail at trial if, in addition to establishing a prima facie

case, he persuades a reasonable jury that the reason advanced for his discharge . . . was unworthy of credence." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1113 (2d Cir. 1988). A plaintiff may rebut an employer's proffered explanation "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziadio*, 817 F.3d at 430 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

Plaintiff has put forth evidence that "the reason advanced for his discharge . . . [is] unworthy of credence." *Dister*, 859 F.2d at 1113. A reasonable jury could conclude that Plaintiff's purported "dishonesty" was not the real reason for Plaintiff's termination. Viewing the facts in the light most favorable to the non-moving party, the Court accepts that Plaintiff did not in fact lie to the human resources department. When asked about his attendance at an "assembly," he responded by referencing the only assembly he had recently attended.

According to Defendant, even if "UNIS was ultimately wrong about Plaintiff's misconduct," the school honestly believed he was being dishonest and therefore had grounds to terminate him. Def.'s Mot. at 12. "[A] valid legitimate, nondiscriminatory reason for termination . . . need not be correct, only honestly held." *Shah v. Eclipsys Corp.*, No. 08-CV-2528, 2010 WL 2710618, at *10 (E.D.N.Y. July 7, 2010). However, "pretext can be established by a showing that the 'asserted neutral basis was so ridden with error' that the employer obviously could not honestly have relied on it." *Dister*, 859 F.2d at 1113 (quoting *Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir. 1980)). "The distinction lies between a poor business decision and a reason manufactured to avoid liability. Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness." *Id.* at 1116.

Plaintiff has put forth enough evidence for a reasonable jury to conclude that UNIS's

investigation was "so ridden with error" and "lacking in merit" as to suggest that their proffered

reason for termination was not honestly held.  *Id.*  The evidence supports Plaintiff's argument that

UNIS may have misled Plaintiff as to the purpose of his conversations with the human resources

department leading to unnecessary confusion during the September 17, 2018 meeting and a messy

investigation.

Before the September 17, 2018 meeting, Ms. Havericak told Plaintiff that they would be

discussing his request for a medical accommodation.  Klein Decl. Ex. 45 (suggesting a meeting to

"discuss this and the other concerns you [Plaintiff] have raised.").  Ms. Havericak also intended to

ask him "about September 7, 2018, to gain clarification because there were different stories

regarding whether or not Plaintiff left on September 7, 2018 at 2:30 P.M. or if he was at the junior

school assembly." 56.1 Statement ¶ 116.  Plaintiff was not told about this second purpose of the

meeting.

During the meeting, Ms. Havericak was the first to bring up the assembly.  She said, "[s]o tell

me, so Friday, can you talk to me again about sort of the events of Friday and what prompted the

email Friday afternoon?  Because it was the junior school assembly that you were at." Sept. 17, 2018

Tr. at 2.  Plaintiff responded by describing his conversation with Mr. Roache about his work

schedule.  *Id.* at 2–3.  He did not confirm that he attended an assembly on Friday.  Later in the

conversation when Plaintiff acknowledged that he attended "the assembly," Ms. Havericak did not

ask Plaintiff to describe the nature of the assembly or the date of the assembly.  *Id.* at 5–6.  Crediting

Plaintiff's account of what happened during these meetings, Plaintiff never lied about his attendance

at the September Assembly; he truthfully stated that he had attended the August Assembly and that

on the day of that assembly, he did not leave until 3:00 p.m.  A reasonable jury reviewing the

transcript from the September 17, 2018 meeting could conclude that Ms. Havericak's questioning

was imprecise, vague, and evasive and that Plaintiff answered the questions honestly as he

understood them.

In addition, Plaintiff's narrative of what happened at "the assembly" was consistent between the first meeting on September 10, 2018 and the second meeting on September 17, 2018:  he said Ms. Cruz was seated next to him and could verify that he was feeling unwell and that part way through the event he stood up in order to alleviate his back pain.  *Compare id.* at 10–11 ("Had to go to standing because, as [Isabelle Cruz], she said to me, 'What's wrong with you?' Because I couldn't stay sitting.  And I said, 'I have a problem.  My back is killing me and I can't sit anymore.'"), *with* Klein Decl. Ex. 44 ("JF was at the JS assembly and 'was becoming faint and nauseous' so he had to stand up because the chair wasn't good for his back.  Claims this can be validated by Isabel Cruz who asked if he was ok.").  A jury could find that his consistent narrative of events further supports his contention that he never lied to Ms. Havericak and that he provided sufficient information for her to verify what happened.

Following this meeting, Ms. Havericak conducted an investigation.  A reasonable jury could conclude that Ms. Havericak's investigation was "so ridden with error that the employer obviously could not honestly have relied on it."  *Dister*, 859 F.2d at 1113.  UNIS verified that Ms. Cruz was not on campus on September 7, 2018 but did not ask her any other questions or even mention Plaintiff by name.  For instance, Ms. Havericak neglected to ask Ms. Cruz if she had recently been at an assembly with Plaintiff or if she recalled an incident where he complained of back pain.  Doing so might have confirmed that Plaintiff was talking about a different assembly.  Ms. Havericak also neglected to interview Mr. Bassene, the second individual that Plaintiff said could verify his narrative of events.

And finally, Plaintiff has shown that Defendant did not follow their legal counsel's advice.  Venable counseled UNIS not to terminate Plaintiff if he walked back any of his previous misrepresentations.  Klein Decl. Ex. 49, at 3 ("If he tries to walk back his prior dishonest statements,

I recommend you suspend him for the time being.").  That is exactly what happened at the September 28, 2018 meeting:  Plaintiff made it clear that he had been talking about a different assembly—not the September Assembly—and that he had not lied to human resources.  UNIS made the decision to terminate him nonetheless.  It did so rather than placing him on leave as recommended by their counsel, which would have provided them with an opportunity to verify the accuracy of his assertions.  It did not do so.  A reasonable jury could conclude from this evidence that Defendant was not actually terminating plaintiff for lying about his attendance at an assembly and that Plaintiff's purported "dishonesty" was merely pretext.

Plaintiff has put forth sufficient evidence to call into question UNIS's proffered explanation for his termination.  And whether or not UNIS honestly believed that Plaintiff was dishonest must be determined by the factfinder.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

b.  Evidence of Retaliatory Intent

In addition to questioning the sincerity of UNIS's grounds for termination, Plaintiff has put forth evidence of retaliatory intent and discriminatory animus.  First, the school's sudden insistence that Plaintiff change his work schedule, which had been the same for over 18 years, after his return from FMLA leave, could lead a reasonable jury to conclude that Plaintiff was being retaliated against for going on leave.  Second, Ms. Havericak's crude comments about Plaintiff following the September 17, 2018 meeting may indicate retaliatory animus to a reasonable jury.  She may have cursed at Plaintiff behind his back because she found him to be a boor, as Defendant suggests.  But a reasonable jury could also conclude that she did so out of anger or exasperation as a result of his exercise of his protected rights.

Ms. Havericak, however, did not make the ultimate decision to terminate Plaintiff.  56.1

Statement ¶¶ 165, 172.  According to Defendant, "Human Resources could not make a decision to terminate an employee without Dr. Brenner's input" and during the meeting on September 28, 2018, "Mr. Uy informed Plaintiff that his employment was terminated for dishonesty."  *Id.*  UNIS, however, is still liable if Ms. Havericak was motived by a discriminatory or retaliatory animus and was involved in the termination decision.  "[T]he 'cat's paw' metaphor now 'refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.'"  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (quoting *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)).  "Under the cat's paw theory, 'if a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . .'"  *Campbell v. Nat'l Fuel Gas Distrib. Corp.*, 252 F. Supp. 3d 205, 214 (W.D.N.Y. 2017), *aff'd*, 723 F. App'x 74 (2d Cir. 2018) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).

Ms. Havericak was integral to the termination decision.  She was actively involved in the investigation of Plaintiff, communicated the results of that investigation to UNIS's legal counsel, and was present during all of the meetings with Plaintiff, including on September 28, 2018 when he was terminated.  56.1 Statement ¶¶ 98, 105, 113, 160, 167.  Therefore, if she had discriminatory animus and intended to cause Plaintiff's termination, Defendant would be liable.

There is evidence that Ms. Havericak may have been motivated by animus.  During the September 17, 2018 meeting, Plaintiff raised several concerns about how UNIS was handling his return from disability leave and his various requests for accommodations.  He explicitly told Ms. Havericak that he felt as though he was being retaliated against because of his medical leave.  Sept. 17, 2018 Tr. at 4 ("So, I'm looking at this and I'm saying, clearly this is retaliation for my being out

on disability.  And it's some sort of a punishment for my having continued medical conditions.").

At the end of the meeting, Ms. Havericak called Plaintiff a "f\*\*k face" and said that he should "shut

the f\*\*k up." *Id.* at 39.  While Ms. Havericak may have been upset about something else that took

place during the meeting, a reasonable jury could conclude that she made those comments in

reference to his complaints of retaliation and that she was suggesting that Plaintiff should "shut the

f\*\*k up" about his concerns.[2]  UNIS terminated Plaintiff less than two weeks after he voiced this

concern.  Therefore, Plaintiff has offered sufficient evidence to survive summary judgment on his

claim for retaliation under the FMLA.

## B.  Unlawful Retaliation under the NYCHRL[3]

Defendant's motion for summary judgment with respect to Plaintiff's NYCHRL retaliation

claim is also denied because Plaintiff was terminated shortly after he complained about

discrimination on the basis of his disability.  "[T]o prevail on a retaliation claim under the NYCHRL,

the plaintiff must show that she took an action opposing her employer's discrimination, and that, as

a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging

in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)

(citing *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011) ).  "The New York Court of

Appeals has held that 'oppos[ing] any practice' can include situations where a person, before the

retaliatory conduct occurred, merely 'made clear her disapproval of [the defendant's] discrimination .

. . .'" *Id.* (quoting *Albunio*, 16 N.Y.3d at 479) (alterations in original).  "[N]o challenged conduct may

---

[2] Ms. Havericak testified at her deposition that she made these comments because it had been a "really frustrating meeting" and that Plaintiff made it difficult for her to get answers to her questions in order to do her job.  Klein Decl. Ex. 6 ("Havericak Deposition I"), Tr. 102:15–25.  It is up to the jury to weigh that testimony and determine whether or not her "frustration" had anything to do with his recent leave, his requests for accommodation, or something else.
[3] Plaintiff initially brought claims for disability discrimination and retaliation under both the NYSHRL and the NYCHRL.  However, in his opposition, Plaintiff said he is no longer pursuing his claims under the NYSHRL.  "Since Plaintiff's legal rights are fully and expansively protected under the NYCHRL, Plaintiff hereby agrees to voluntarily dismisses [sic] his state law claims under the NYSHRL."  Opp'n at 23 n.4.  The Court therefore finds that Plaintiff has expressly abandoned all of his claims under the NYSHRL and dismisses them.

be deemed nonretaliatory" unless "a jury could not reasonably conclude from the evidence that such conduct was. . . reasonably likely to deter a person from engaging in protected activity." *Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 34 (2009) (internal quotation marks omitted). The NYCHRL is a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall." *Id.* at 109 (internal quotation marks omitted). The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio*, 16 N.Y.3d at 477–78).

Plaintiff's NYCHRL claim is based not on his complaint about the denial of his FMLA rights but, rather, on a complaint about discrimination on the basis of his disability.[4] Defendant argues that Plaintiff's NYCHRL retaliation claim fails as a matter of law because "Courts in this Circuit have repeatedly held that FMLA leave is not a 'protected activity' under the NYSHRL or the NYCHRL." Def.'s Mot. at 19. Under the NYCHRL, it is "an unlawful discriminatory practice for any person engaged in any activity *to which this chapter applies* to retaliate or discriminate in any manner against any person because such person has [engaged in protected activity under the NYCHRL]." N.Y.C. Admin. Code § 8-107(7) (emphasis added)). Because FMLA leave is protected by federal law, not by the NYCHRL, Defendant is correct that taking FMLA leave is not a "protected activity" under the NYCHRL. *See e.g.*, *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) ("While she alleges that she was retaliated against for taking FMLA leave, this is not a 'protected activity' under Title VII, the ADEA, the NYSHRL, or the NYCHRL."); *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 367 (S.D.N.Y. 2016) ("Taking

---

[4] Defendant suggests that Plaintiff's theory of retaliation under the NYCHRL was raised "for the first time" in Plaintiff's opposition and therefore must be dismissed. Reply at 3. The Court disagrees with Defendant's characterization of Plaintiff's "theory" of retaliation. He alleged in the First Amended Complaint that "Defendant UNIS unlawfully retaliated against Plaintiff for exercising his protected rights pursuant to the NYSHRL, NYCHRL and FMLA by baselessly terminating his employment." Complaint ¶ 80. The Court therefore construes the Complaint to cover the theory of retaliation articulated in his opposition, namely, that UNIS retaliated against him for raising his concerns of discrimination at the September 17, 2018 meeting. Opp'n at 33.

FMLA leave is not a protected activity within the meaning of the NYCHRL."). However, under the NYCHRL, summary judgment is only appropriate "if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." *Mihalik*, 715 F.3d at 113. And Plaintiff also alleges that he was retaliated against for complaining to UNIS's human resources department about discrimination on the basis of his disability. Opp'n at 33.

Raising concerns of discrimination with a human resources department is categorically a protected activity under the NYCHRL. *See Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 51 (S.D.N.Y. 2009) ("Raising concerns of discrimination to a human resources department is quintessential protected activity" under the NYCHRL.). Plaintiff reported his concerns that he had been discriminated against on the basis of his disability to Ms. Havericak during the September 17, 2018 meeting. He told Ms. Havericak that the sudden change to his schedule felt like "retaliation for my being out on disability. And it's some sort of a punishment for my having continued medical conditions." Sept. 17, 2018 Tr. at 4. Under the NYCHRL, voicing this concern about discrimination on the basis of his disability qualifies as a protected activity. Eleven days after voicing this concern to Ms. Havericak, Plaintiff was terminated. 56.1 Statement ¶¶ 167, 172.

A reasonable jury could find that the decision to fire Plaintiff was made, in part, because he raised these concerns to Ms. Havericak during the September 17, 2018 meeting. As described above, that meeting ended with Ms. Havericak calling Plaintiff a "F**k face" and telling him to "shut the f**k up" after he left the room. Sept. 17, 2018 Tr. at 39. Considering this evidence in the light most favorable to Plaintiff, a reasonable jury could determine that UNIS fired him, in part, because he raised these concerns to Ms. Havericak. Plaintiff has therefore raised a triable issue regarding whether his termination was related to the concerns he raised about retaliation and discrimination

during the September 17, 2018 meeting with the human resources department.[5]

### C. Disability Discrimination under the NYCHRL

Defendant is also not entitled to summary judgment on Plaintiff's claim for disability

discrimination under the NYCHRL because a reasonable jury could find that discrimination played

some role in UNIS's termination decision.  Section 8-107(1)(a) of the NYCHRL makes it

> an unlawful discriminatory practice . . . [f]or an employer or an employee or agent
> thereof, because of the . . . race, . . . color . . . national origin[, or] disability . . . of any
> person, . . . [t]o refuse to hire or employ or to bar or to discharge from employment
> such person[] or [] [t]o discriminate against such person in compensation or in terms,
> conditions or privileges of employment.

N.Y.C. Admin. Code § 8-107(1)(a).  The NYCHRL "defines disability as 'any physical, medical,

mental or psychological impairment, or a history or record of such impairment.'" *Est. of Benitez v.*

*City of New York*, 141 N.Y.S.3d 51, 55, *leave to appeal denied sub nom. Benitez v. City of New York*, 37

N.Y.3d 906 (2021) (quoting N.Y.C. Admin. Code § 8-102).

"It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has

been modified for NYCHRL claims."  *Mihalik*, 715 F.3d at 110 n.8.  The Second Circuit has noted,

however, that resolution of that question is "not necessary," because the NYCHRL has

> simplified the discrimination inquiry:  the plaintiff need only show that her employer
> treated her less well, at least in part for a discriminatory reason.  The employer may
> present evidence of its legitimate, non-discriminatory motives to show the conduct
> was not caused by discrimination, but it is entitled to summary judgment on this basis
> only if the record establishes as a matter of law that "discrimination play[ed] *no role*" in
> its actions.

*Id.*  (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n. 27 (1st Dep't 2009))

---

[5] To the extent Plaintiff is also raising his request for an accommodation as the basis for his NYCHRL retaliation claim, failure to accommodate was not an independent, viable cause of action under the NYCHRL at the time of the events in this case.  *D'Amico v. City of New York*, 73 N.Y.S.3d 540, 541 (1st Dep't 2018) ("plaintiff's request for a reasonable accommodation" does not constitute a "protected activit[y] for purposes of the [NYSHRL and NYCHRL].").  The NYCHRL was amended in 2019 to expressly include requesting an accommodation as a protected activity.  However, that amendment does not apply retroactively.  *See Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 724 (S.D.N.Y. 2020) (adopting the report and recommendation's finding that "the 2018 amendment is not retroactive" and that "under the previous version of the NYCHRL, a request for accommodation is not protected activity").

(alteration in original).  Unlike Title VII, the NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'"  *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik*, 715 F.3d at 114).

"The Court considers the totality of the circumstances, and while courts may dismiss truly insubstantial cases, even a single comment may be actionable in the proper context . . . ."  *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015) (internal quotation marks omitted).  Nonetheless, the NYCHRL "is not a 'general civility code.'"  *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S. 2d 27, 40-41 (1st Dep't 2009)).  "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss.  She must show that she has been treated less well at least in part '*because of* her [protected characteristic].'"  *Id.* (citing *Williams*, 872 N.Y.S. 2d at 39, 40 n.27).

The Court cannot conclude on the facts presented that discrimination played no part in UNIS's termination decision.  Plaintiff points to much of the same evidence that underlies his claims for retaliation, including the timing of the termination decision, the comments made by Ms. Havericak at the end of the September 17, 2018 meeting, Plaintiff's perception that he was treated differently after returning from disability leave, and the factual discrepancies underlying Defendant's purported justification for termination.  Opp'n at 24–29.  Plaintiff also points to UNIS's failure to grant his request for a modified work schedule.  *Id.* at 32 n.8.

    1.  Plaintiff's Disability

Plaintiff has set forth sufficient evidence for a reasonable jury to conclude that Plaintiff is disabled within the meaning of the NYCHRL.  "Disability" is defined as "any physical, medical, mental or psychological impairment, or a history or record of such impairment" which can include,

> an impairment of any system of the body; including, but not limited to:  the neurological system; the musculoskeletal system; the special sense organs and

respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system.

N.Y.C. Admin. Code § 8-102.  "The New York State Executive Law and the New York City Administrative Code have a broader definition of 'disability' than does the ADA; neither statute requires any showing that the disability substantially limits a major life activity."  *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009) (citing *Giordano v. City of New York*, 274 F.3d 740, 753 (2d Cir. 2001)); *see also Spiegel v. Schulmann*, 604 F.3d 72, 82 (2d Cir. 2010) (noting that the NYCHRL's definition of disability "is, on its face, broader than that provided by the NYSHRL.").  According to Plaintiff and his treating physician, Plaintiff suffers from numerous physical and medical impairments including hypertension, a torn rotator cuff, a torn labrum, two torn meniscuses, and various back issues.  Klein Decl. Ex. 38; Fasanello Dep. at 29:3–10.  A reasonable jury could therefore conclude that Plaintiff is disabled as defined by the NYCHRL.

### 2.  Temporal Proximity

The temporal proximity between Plaintiff's requests for accommodation and termination from UNIS could lead a reasonable jury to conclude that UNIS had a discriminatory motive in terminating Plaintiff.  It is undisputed that simultaneous with Defendant's investigation into Plaintiff's purported misrepresentation, Plaintiff was requesting additional accommodations to support his disability.  *Id.* ¶ 150.  His request for a modified work schedule was still under consideration by UNIS at the time of his termination.  *Id.*  Plaintiff had also recently indicated that he might need additional accommodations depending on the outcome of an appointment he had with his physician.  *Id.*; Klein Decl. Ex. 50.  Therefore, Plaintiff has presented evidence that these accommodation requests may have played some part in UNIS's termination decision.

### 3.  Ms. Havericak's Comments

Plaintiff has also presented evidence of Ms. Havericak's discriminatory motive.  As described

above, a reasonable jury could view Ms. Havericak's comments at the end of the September 17, 2018 meeting as evidence of discriminatory animus and conclude that the termination decision was driven, at least in part, by Plaintiff's medical conditions.  Ms. Havericak's suggestion that Plaintiff should "shut the f**k up" after Plaintiff discussed his medical conditions and requested a modified work schedule, could lead a reasonable jury to conclude that her frustration was the result of Plaintiff's efforts to protect his health.

4.   The Interactive Process

A reasonable jury could also conclude that UNIS's handling of Plaintiff's disability accommodation requests is evidence of UNIS's discriminatory motive.  Failure to engage in the interactive process in good faith "is relevant primarily to the issue of whether a reasonable accommodation was available for the employee's disability and does not substantially impact the court's or the factfinder's determination of causation." *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 n.2 (2014).  However, the New York Court of Appeals has also noted that an "employer's failure to hold a constructive dialogue about the possibility of a reasonable accommodation may indicate that the employer has discriminated 'because of' an individual's disability within the meaning of . . . the [NYCHRL]." *Id.*; *see also Wellner v. Montefiore Med. Ctr.*, No. 17 CIV. 3479, 2019 WL 4081898, at *11 (S.D.N.Y. Aug. 29, 2019) ("[A] court can consider a defendant's failure to engage in an interactive process as evidence that the defendant engaged in discrimination or retaliation.").

Plaintiff contends that UNIS did not engage in a good faith interactive process in response to Plaintiff's requests for accommodation and that its failure to do so serves as additional evidence of discrimination.  Opp'n at 32.  The Court concludes that based on the evidence presented, viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that the interactive process was not handled in good faith and that this could contribute to a finding of discrimination.

Plaintiff's September 12, 2018 email to Ms. Havericak attached a letter from letter from Dr.

Lara. The letter described why Plaintiff needed an earlier work schedule:

> Of extremely serious concern are Mr. Fasanello's periods of elevated blood pressure, which historically occur in the afternoon hours of the work day. In order to control his elevated blood pressure as much as possible, and in consideration of his extremely serious heart condition, I strongly recommend to Mr. Fasanello that he schedule his work day in such a way as to leave his office for home by 2:30 p.m. every day.

Klein Decl. Ex. 46. On September 21, 2018, in response to this letter from Dr. Lara, Ms. Havericak

told Plaintiff that "the note is silent as to why or how the requested modification to your work

schedule would accommodate your blood pressure or other medical conditions. We simply do not

understand how a 90-minute adjustment to your work schedule helps you with your medical

condition." Klein Decl. Ex. 50, at 3. UNIS, however, was still "willing to discuss a modified

schedule of some kind" but required Plaintiff to "provide an explanation for why [he] need[s] the

requested modification." *Id.*

There is nothing wrong with an employer requesting additional information from an

employee about his accommodation request. In fact, doing so is often a necessary part of the

interactive process, as employers are obligated to identify the needs of the employee and assess the

reasonableness of the requested accommodation. *See Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126

N.Y.S.3d 98, 102 (1st Dep't 2020) ("Under . . . [the] City HRL[], 'the first step in providing a

reasonable accommodation is to engage in a good faith interactive process that assesses the needs of

the disabled individual and the reasonableness of the accommodation requested.'" (quoting *Phillips v.

City of New York*, 884 N.Y.S.2d 369, 373 (1st Dep't. 2009))). Here, however, there is additional

evidence that could lead a reasonable jury to find that UNIS did not engage in the process in good

faith.

First, as described above, Ms. Havericak—who had made crude comments about Plaintiff—

was simultaneously responsible for responding to Plaintiff's request for accommodation and

investigating his purported misrepresentation.  These issues were being addressed at the same time

by the same person.  And before UNIS made a decision about Plaintiff's accommodation request,

Plaintiff was terminated from his position as a result of Ms. Havericak's investigation.  Second,

Plaintiff provided UNIS with Dr. Lara's letter on September 12, 2018.  Klein Decl. Ex. 46.  UNIS

waited over a week before responding and asking for additional information.  A reasonable jury

could conclude this delay was intentional because, at this point, UNIS was in the midst of an

investigation that ultimately resulted in Plaintiff's termination.

    And finally, while there is nothing wrong with requesting additional information from an

employee making an accommodation request, one potential reading of Ms. Havericak's response to

Plaintiff's doctor's note is that she was asking Plaintiff to provide a second doctor's note when the

first seemed to be sufficient.  Dr. Lara said that Plaintiff's blood pressure was historically higher in

the afternoon and therefore, "[i]n order to control his elevated blood pressure as much as possible,

and in consideration of his extremely serious heart condition, I strongly recommend to Mr.

Fasanello that he schedule his workday is such a way as to leave his office for home by 2:30 p.m.

every day."  Klein Decl. Ex. 46.  In response, Ms. Havericak said "[w]e simply do not understand

how a 90-minute adjustment to your work schedule helps you with your medical condition."  Klein

Decl. Ex. 50.  A reasonable jury could conclude that Dr. Lara's September 11, 2018 note made clear

why the adjustment to his work schedule was necessary.  Of course, another reading of Ms.

Havericak's response to Dr. Lara's letter is that UNIS wanted to gather additional information to

better understand why the 90-minute adjustment was necessary for Plaintiff's health.  The Court

cannot choose between these competing characterizations of Ms. Havericak's September 21, 2018

email.  This is an issue best resolved by the factfinder.

    Because, reading all of the evidence in the light most favorable to Plaintiff, a jury could

reasonably conclude that Plaintiff was terminated because of discrimination, the Court must deny

Defendant's motion to dismiss Plaintiff's disability discrimination claim.

### D.  Failure to Provide a Reasonable Accommodation Under the NYCHRL

Defendant's motion for summary judgment on Plaintiff's failure to provide a reasonable accommodation claim is granted because Plaintiff has not put forth evidence that his accommodation requests were denied by UNIS.  The NYCHRL provides that

> it is an unlawful discriminatory practice for any person prohibited by the provisions of this section from discriminating on the basis of disability not to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity.

N.Y.C. Admin. Code § 8-107(15); *see also Ikedilo v. Montefiore Med. Ctr.*, No. 19-CV-9967, 2021 WL 3887717, at *8 (S.D.N.Y. Aug. 31, 2021) ("The relevant provision of the administrative code makes it [] 'an unlawful discriminatory practice for any [covered] person ... not to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question.'" (quoting N.Y.C. Admin Code § 8-107(15))).  "'The standard under the NYCHRL is liberal, but not boundless.'  Even under its permissive standard, a plaintiff must still establish a *prima facie* case . . . ." *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 74 (S.D.N.Y. 2016) (quoting *LeBlanc v. United Parcel Serv.*, No. 11-CV-6983, 2014 WL 1407706, at *13 (S.D.N.Y. Apr. 11, 2014)).

The Court dismisses Plaintiff's failure to accommodate claim because no reasonable jury could find that UNIS failed to provide Plaintiff with a requested accommodation.  The court considers each of Plaintiff's requests for accommodation in turn.

#### 1.  Dr. Lara's August 13, 2018 Note

Upon returning from medical leave, Plaintiff requested several ergonomic items to help with his orthopedic conditions.  August 13 Doctor's Note.  Plaintiff acknowledges that he received all of them.  56.1 Statement ¶ 70.  In that same letter, Plaintiff's doctor said it was "essential" that Plaintiff

36

continue to work in his current office because a "stable temperature environment should help overall with [Plaintiff's] medical conditions." *Id.* Plaintiff was never relocated from his office. 56.1 Statement ¶¶ 70, 130, 131. Though Plaintiff acknowledges that he was provided with both accommodations described in Dr. Lara's letter, he argues that because Ms. Havericak asked Plaintiff if he would like "to relocate from his private office," the school "directly contravened the recommendations of Dr. Lara." Opp'n at 30. The Court disagrees that Ms. Havericak's question is a "refusal" of Plaintiff's request for accommodation. When asked if he would like to move offices, Plaintiff said no and Plaintiff was never relocated. Merely asking an employee about the possibility of moving to another work environment is not a violation of this part of the statute. Therefore, no reasonable jury could conclude that UNIS failed to provide Plaintiff with the accommodations identified in Dr. Lara's August 13, 2018 letter.

2. Plaintiff's Request for a Modified Work Schedule

Plaintiff also requested a modified work schedule. Klein Decl. Ex. 50. Plaintiff had always worked from approximately 6:30 a.m. until 2:30 p.m. and requested permission to maintain that schedule despite Dr. Brenner's new policy that all employees stay on campus until 4:00 p.m. As of the date of Plaintiff's termination, UNIS was still actively considering his request. *Id.* Plaintiff does not point to any evidence that his request to work a modified schedule was rejected nor that he was forced to change his hours while his accommodation request was pending. Defendant correctly points out that an employer's "request for additional information is not a denial of Plaintiff's accommodation request." Def.'s Reply at 12. Therefore, Plaintiff has not shown that UNIS failed to accommodate his request for a modified work schedule.

      3.   <u>Plaintiff's September 26, 2018 Email</u>

And finally, Plaintiff argues that his September 26, 2018 email to Ms. Havericak was an additional request for accommodation that was refused. However, that email did not identify any specific accommodations. Instead, Plaintiff wrote,

> I expect that I may need some additional accommodations from the school with respect to my orthopedic conditions (of which, the school should already be aware based on prior letters from my doctor), which I also plan to discuss with my doctor when I return from my vacation. It would be ideal if you and I might be able to meet to discuss these additional accommodations shortly after my doctor appointment.

Klein Decl. 50. Plaintiff does not point to any evidence that the additional requests for accommodation, alluded to in that email, were ever denied. In fact, Plaintiff's email makes clear that he would like the opportunity to discuss these possible additional accommodations only after he meets with his doctor. Defendant cannot have refused an accommodation that was never requested.

      4.   <u>Alleged Lack of Good Faith Interactive Process Does Not Preclude Summary Judgment</u>

Because Plaintiff has failed to identify any accommodation that was denied to him, Plaintiff's contention that the interactive process was not undertaken in good faith does not preclude the entry of summary judgment in favor of Defendant.[6] Plaintiff argues that because there is a dispute as to whether or not the interactive process was adequately handled, the Court must deny Defendant's motion for summary judgment with respect to Plaintiff's failure to accommodate claim. Opp'n at 40. In support of this argument, Plaintiff points to select language from the Court of Appeals'

---

[6] As discussed above, the process used by UNIS to evaluate Plaintiff's accommodation requests may be relevant to Plaintiff's disability discrimination claim, as a reasonable jury could consider it evidence of discriminatory animus. *See Jacobsen*, 22 N.Y.3d at 838 n.2 ("[An] employer's failure to hold a constructive dialogue about the possibility of a reasonable accommodation may indicate that the employer has discriminated 'because of' an individual's disability within the meaning of . . . the [NYCHRL] . . . ."). However, while Defendant's alleged failure to hold a good faith constructive dialogue regarding Plaintiff's accommodation requests may suggest discriminatory intent, it does not preclude summary judgment on Plaintiff's failure to accommodate claim where, as here, there is no evidence that any of Plaintiff's accommodation requests were refused.

decision in *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824 (2014). There, the Court of

Appeals held that:

> In light of the importance of the employer's consideration of the employee's proposed
> accommodation, the employer normally cannot obtain summary judgment on a State
> HRL claim unless the record demonstrates that there is no triable issue of fact as to
> whether the employer duly considered the requested accommodation. . . . And,
> because the City HRL provides broader protections against disability discrimination
> than the State HRL, the City HRL unquestionably forecloses summary judgment
> where the employer has not engaged in a good faith interactive process regarding a
> specifically requested accommodation.

*Id.* at 837–38 (citations omitted).

Plaintiff makes too much of this language, claiming that it precludes the entry of summary

judgment in all cases. It does not. As the Court of Appeals wrote in *Jacobsen*, its "conclusion that, in

all but the most extreme cases, the lack of a good faith interactive process forecloses summary

judgment in favor of the employer should not be construed too broadly." *Id.* at 838. "[T]o the

extent the Appellate Division's decision in *Phillips* can be interpreted as implying that a good faith

interactive process is an independent element of the disability discrimination analysis under either

the State or City HRL which, if lacking, automatically compels a grant of summary judgment to the

employee or a verdict in the employee's favor, we reject that notion." *Id.* (citation omitted).

Defendant is entitled to summary judgment here because there is no evidence that Plaintiff

was denied an accommodation. In that fundamental way, this case is distinguishable from *Jacobsen*,

where the plaintiff alleged that he had been denied a reasonable accommodation. Because denial of

a reasonable accommodation is an essential element of Plaintiff's claim against Defendant for failure

to accommodate his disability, Plaintiff cannot prevail even if he could prove that there was no good

faith interactive process. Therefore, the Court grants Defendant summary judgment on Plaintiff's

failure to accommodate claim under the NYCHRL.[7]

---

[7] The Court notes that there is an independent cause of action for failure to engage in a cooperative dialogue under the
NYCHRL. *See* N.Y.C. Admin. Code § 8-107(28). Section 28 of the NYCHLR now makes it "independently actionable"

### E.  Age Discrimination

Defendant's motion to dismiss Plaintiff's claims for age discrimination is granted.  Plaintiff alleged discrimination on the basis of his age under the ADEA, NYCHRL and NYSHRL, Compl. ¶¶ 84–93, but he has expressly abandoned those claims.  In his opposition, Plaintiff stated that "he is only pursuing his disability discrimination and retaliation claims against UNIS, not age discrimination" and "does not oppose Defendant's motion to dismiss his age discrimination claims under federal, state and city law."  Opp'n at 35.  The Court therefore finds that Plaintiff has abandoned his claims of age discrimination and dismisses them.

### F.  CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion for summary judgment with respect to Plaintiff's disability discrimination claim under the NYCHRL, his retaliation claim under the NYCHRL, and his FMLA retaliation claim.  The Court grants Defendant's motion for summary judgment with respect to Plaintiff's failure to accommodate claim under the NYCHRL.  Plaintiff's age discrimination claims and all his claims under the NYSHRL are dismissed at the request of Plaintiff.

The Clerk of Court is directed to terminate the motion currently pending at Dkt. No. 82.

SO ORDERED.

Dated:  March 23, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

for an employer to "refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require such an accommodation." N.Y.C. Admin. Code § 8-107(28); *see also Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 103 (1st Dep't 2020) (The amendment "'legislatively modif[ied] the holding of *Jacobsen v. N.Y.C. Health & Hosp. Corp.*, 22 N.Y.3d 824, 838 [] (2014), which held that refusal to engage in a good faith interactive process is not independently actionable under the HRL.'" (quoting Report of the Governmental Affairs Division, Committee on Civil Rights, December 18, 2017, at 4)).  Plaintiff did not include a claim for failure to engage in the interactive process in his amended complaint.  *See* Compl.  Nor did Plaintiff raise the applicability of this cause of action in his opposition.  Plaintiff pleaded claims under the NYCHRL only for disability discrimination, retaliation, and failure to accommodate.